Good morning, your honors. Jason Carr, appearing on behalf of the Appellant's Registration Bureau. At the leave of the court, I intend to reserve a minute of my time for rebuttal. This is a Fourth Amendment matter, and like all Fourth Amendment cases, it's heavily fact-dependent. And I feel forced to constrain, at least at the inception, that the case seems like a heavy, a hard road to hoe, I should say, for Monroe. At first blush, it seems like the government has a pretty strong case. But there are some interesting aspects of this matter that deserve discussion. The first question is, under what rubric of Fourth Amendment analysis should we employ to analyze the situation? And I would submit that there are multiple stages of the encounter here that have to be analyzed differently, but we'll start with the inception. Why isn't everything irrelevant until they tell him he's free to leave, and then after, as he's walking out, ask for his consent? I mean, isn't just all the predecessors just Not necessarily. If there's an initial illegality, then that would taint the consent. Why does it taint anything, though, after he's free to leave, and they're not holding him anymore, and he's walking out down the stairs? The case would support the assertion that even if consent is acquired after an initial illegal seizure, then that consent is going to be tainted by the seizure. If it's after, it's over, it's finished with? Well, there would be factors that would be a continuation, intervening circumstances and such, but it is true. Oh, he's free to go, and at least according to the factual findings, he started down the steps in front of the apartment. Isn't that a break between what happened before and the moment he gives his consent? And that is true, and it is, I would be forced to concede once again that the fact that he was told he was free to leave and started to walk down the steps before the officers had any mind to pat you down, that's the worst aspect of this case for me. There's no question about it. But there's an interesting aspect of this matter that I think deserves some discussion, and that is that they had this interesting trespass-type procedure going on in this apartment, and this is in the record. The officer talks about it on page 62 and 63 of the excerpt of the record. And that is essentially that they go in and basically trespass anybody who is not a leaseholder in the apartment complex. Trespass meaning ask them to leave? Right, which means are they really free to go? You're free to leave, you're free to go exactly where I tell you. You're free to leave, but you're not free to stay. Exactly. So there is still some constraint on his liberty. Was he really free to go? Like many terms in the law, it doesn't mean exactly what it says. It is a legal term that means is there any more constraint on your freedom? Is the law enforcement officer exercising authoritative control over this individual any longer? And here, I believe we have a strong contention that he was. Because Mr. Monroe was not really free to go or free to stay. He was free to go exactly where they were telling him, which is off the premises. He was free to go anywhere except that apartment. Well, off the property line. He wasn't free to stand on the stairs. He wasn't free to walk down the stairs and stand there. He wasn't free to go into another apartment complex. He was not free to do anything except for leave to follow the officer's directive. That leaves most of the world available to him. And I have difficulty understanding how that causes his subsequent consent to search to be tainted. I mean, if he can go any place in the world except here, where's the constraint or where's the inhibition that causes that consent to be tainted? Well, our argument, and Emily, there is no clear line here, is that the consent, well, actually the prior term, free to leave, didn't really mean that you were free from any further restraint. And here the government is trying to say, well, and we see this a lot in highway intervention scenarios where the officer issues the ticket and says, oh, you're free to go. And the person walks back to the car, the officer says, oh, yeah, by the way, can I search your car? Which people, amazingly enough, consent to even though there are drugs in the car. Which never ceases to amaze me. But here, in that situation, the person really is free to go because they can get in their car and drive away. They have absolute freedom. Here, this person is not really free to go. He has some legal constraint on him. And in our estimation, that taints the consent. He was still under your control. He did leave. He did start walking down the stairs. He did fall over and he started down the stairs. And they said, officer, may I pat you down? Sure. Right. Our contention would be that he was not truly free from official restraint until he had, in fact, complied with the officer's order, which is to leave the property. That would be our argument here. And that is mainly what we're relying upon. And also what we're relying upon is this idea that there is an initial illegality. And that's a difficult row for us to hoe as well, I have to admit. Here we have the officers come into the apartment based on the consent of the leaseholder. And of the property owner. Or the manager of the apartment house. And the owner of the property. Exactly. And so, to me, the best analogy in that circumstance when you have officers in your residence to conduct a search for some purpose and there are other residents in the home, there you get into I believe the Michigan v. Summers analysis, which says that if you happen to be in a place that's being searched, officers do have some limited authority to corral you, place you in a... That or is it just a Terry situation? It's as if they were on the street because they were in somebody's house by consent. So it was as if they were on the street. And if they were on the street and in this instance they had some reason to think that there was drug activity, both butane, but also that he told him that he brought the drugs to the location. Which is an interesting statement, I suppose, because he said that I brought them there but I no longer have them. So if you believe him I didn't see the part about I no longer have them. I didn't see the part about I no longer have them. He said, do you have them? He said, no but I brought them here, yes. It's interesting because the government would like the court to believe half of what he said is true, right? That I had drugs, but not the part where he says I no longer have them. Because I've never seen in my 11 years of practice an individual ever arrest for prior drug use or admitting to prior possession of drugs. The fact that he says I do not have them any longer I think weighs against a reasonable suspicion calculus. But here and that's one way to analyze it, but I would submit the better way to analyze it is the Michigan v. Somersing where you have people in mere propiquity, I never can pronounce that word right, but they're in the area where criminal conduct may have occurred, but each individual there doesn't necessarily have a patina of reasonable suspicion around them. And what the Supreme Court has said in those situations where you happen to be in an area that's being searched is that law enforcement only has limited authority to constrain to seize you essentially. They can tell you where to stay and where to sit while they conduct a search for their own officer's safety, but they're not really allowed to interrogate you or ask you questions or do any kind of invasive, even terry-stop seizures. Identity? Identity is once again a questionable area. In Ganwich v. Knapp, a case I relied upon heavily, the court there clearly said that individuals, in this instance in Ganwich, it was an employer residence, a place of employment, the employees were corralled and forced to be subject to interrogation. The court there said that forcing them to be interrogated before they could leave was clearly unlawful. Counsel, if I may interrupt for a minute, isn't Ganwich clearly distinguishable? In that case, the officers used the threat of continued detention to coerce the suspects into submitting to interrogation. Well, I think that there is not an exact parallel, but a parallel here because Mr. Monroe was not allowed to just leave the residence until he gave a valid identification. Didn't Ganwich go out for hours? Yes, it was. It was hours. About seven or eight minutes, which is what we're talking about here. That is true, and it is a matter of degrees, I suppose, but I would argue that Ganwich says that you're not allowed to take these individuals who happen to be in a place being searched and subject them to interrogation, which we would argue includes, to get their identity. Identity in Hybl, which is a case not cited by anybody, but is a recent Supreme Court case out of Nevada that the U.S. Supreme Court held in Hybl, H-I-I-B-L, that it was lawful to get someone to get identity from somebody, if you had reasonable suspicion, to seize them. So I would argue that Hybl requires that there be individual suspicion for each individual that they decided to bring the identity out of. And here, Monroe was detained longer than anybody else because he didn't want to give up his identity or a true one at any rate. And I'm going to read you the rest of my time for rebuttal. Good morning. May it please the Court. I'm Daniel Sheese, appearing on behalf of the United States. The principle for the Fourth Amendment that we're talking about here is reasonableness. Can you tell me what this trespass procedure is and what validates it? I mean, I gather that they were called by the property manager, and they seemed to have some arrangement with her, that they could ask people to leave the premises, and even if they were in somebody's apartment, and A, why do they get to do that, and B, why do they get to ask people's identity while they're doing it? The first question he asks is what's the trespass procedure? It's not clear from the record, at least there's a little bit of difference there. On the 911 call, the property manager was talking to the police dispatcher and said that the people, the person had been TRO'd, I assume that meant a temporary restraining order for a spouse not to be there. Okay, but that person was found, and you're trying to justify remaining there on the grounds that you were, quote, trespassing them. So what is that? The grounds that they were kept the defendant there was that when the police went to the apartment, they went there for a dual purpose. One, to find the person who'd been trespassed, and two, there were allegations of drug activity. And when they walked into that apartment and spoke to the defendant, and he admitted to them. So you don't think that this trespassing had anything to do with the rest of them? You think that the, quote, trespass procedure only applied to that person who already, who was specifically called about? They had a dual purpose. They could ask for identification for everybody who was there. And why? That's what you're trying to find out. Why? Can somebody come into my house and say I want to get the identity of anybody who's in your house? Well, when they went in to find the identity, they could, they had a dual purpose. One, to identify the person who was prohibited from being on the premises. They did that, then what? And then within less than a minute, while they were waiting then for the results to come back from the police, from the dispatcher, they had reasonable suspicion of drug activity. They had the defendant's admission that he had brought drugs to the premises. That isn't what they said. They said they needed to ask their identity of everybody in the room because they had to keep a trespass log, and they were, quote, trespassing them. They didn't say it was because they had suspicion of drug activity. They weren't asked those particular questions. This court, though, can look at the totality of the circumstances. It can look at the fact that the police received the allegation that there was a strong odor of perceived to be drugs. When they went to the apartment, they did not smell it, but when they went in, they had and were confronted with the defendant's admission that he was involved. At that point, that was even before they found and identified the prohibited person. That new event, the admission of drug activity, said to the police officers, you have reasonable suspicion of a crime that either took place or is taking place, compounded with... The only reason I'm having a hard time with this is it's not what they said they were doing. That's not their explanation. And indeed, they ended up letting everybody go. They didn't pat anybody down. They didn't search them. What they did was they kept them there to check their identities. Why? Even when... Why they kept them to check their identities is because even though they didn't say, they weren't asked on the hearing, tell us all the reasons why you're here. This court can infer from the totality of the circumstances that they had a reasonable basis to continue to question them. And when the people are on the premises... You're not trying to justify. Your position is that it is not that it is okay to go in at the request of a property owner and simply ask the identity and write down the names and addresses of everybody on the premises and ask them to leave. Because they were told to leave as well. Why were they told to leave? After the police had gone through their identifications, they told them that they could go. They could have kept the... Why did they want to go? Why did they want to stay? Did they tell them they could stay? They did tell them they could stay, but they don't need to tell them they can stay. They told them they could be free to leave. They believed that they had the authority on behalf of the property manager to ask the people to leave. They believed they were acting on that authority, inherent from their relationship with the manager, to have a number of people leave the apartment. Particularly when they went in there and they saw the four people sitting in the master bedroom surrounding a butane tank, a butane torch. Now, whether they were... If you really want to enforce drug laws and you thought you had a reasonable suspicion, you would do more than find out who they were and tell them to leave. They kept their intrusion. They kept their encounter to a very minimum. It was the least intrusive was simply to ask them if they had drugs. Ask them for their identification. Ask them if they had drugs. When they came back with no warrants, then to let them go. What was going through their mind, why they didn't conduct a full search, why they didn't go through every cupboard, look under every bed, go through every closet, look in every shoe, I don't know. But their approach was within constitutional bounds. They didn't cross the line here because of the reasonable suspicion that came from the defendant. When the defendant says to the police officer, I have drugs, I have drugs, we don't expect them to turn a blind eye or to stand mute and do nothing. Except that's basically what they did. In fact, after they ascertained their identity. And that ascertainment of right is where they chose or how far they chose to go. If they went farther, they would be criticized for doing more than what they did. Here, they took a very minimum intrusion. Their intrusion was justified by the defendant's admission that he brought drugs. That created reasonable suspicion. Even apart from that, when the police told them they were free to leave, I don't know how else they could have told them you're free. You are free to leave. Leave. And he's walking out the front door, down the steps, and as we can tell from the judge's finding and from the record, the court in a polite or the officer in a polite way simply said to them, Kim, can we search you? Can we have your consent to pat you for weapons? And that, under those circumstances, was based upon his given on free will. And those circumstances demonstrate that he was there. It was an intervening event of free will. The other factor in terms of his free will, the contact that they had with him. A very brief encounter, which lasted for less than two minutes after they let the prohibited person go and they got his identification. That was not a flagrant encounter with him. If you look at the totality of the proximity of time, the intervening event of you're free to leave, and their limited contact with him demonstrates that his consent was free will to search and made his search valid. Any further questions? Thank you. I don't have too much to add, but I thought it would help the court. The express pass is talked about on pages 62 through 64, and 89 through 90 of the record. And what's illustrative of my estimation is on page 64, the officer says that when the returns came back, and this is a lot because it starts on line 3, and we can legitimately identify who each person was, they were subsequently trespassed and then removed from the premises. Whatever that means. What does it mean they were trespassed? I can tell you what it means in practice, because I deal with it quite a bit here in Las Vegas. It means that they put you in a log, and they talk a little bit about the log on the record, and then they direct that you leave the premises. And if they catch you back there, then they feel like they have basically... Is that because the statute requires that you have to have been asked to leave and return? That's my surmise. My surmise is that what they're doing is establishing a record so that when you come back, there's a crime that can be applied, but it can't be applied the first time they ask you to leave. Is that what's going on here? It is, and it doesn't really seem to be embedded in any statutory authority. It's an arrangement that the Section 8, which is low-income housing department managers, have reached an agreement with the North Las Vegas Police Department, where they basically make the leaseholders sign an agreement saying they'll allow law enforcement to trespass anybody who comes on the premises, any of their guests, their relatives, and so on and so forth, and then based on that, private property rights waiver. I know in California, for example, that it can't be a criminal trespass until somebody refuses to leave when told to leave, or comes back after they've been told to leave. So I'm assuming that that's why they want to keep this record. Exactly. It seems to be the way it works in North Las Vegas as well, is that they keep a log, they tell people to leave, they don't arrest them the first time, but if they're flagrant offenders, then they do. No, because they can't. They cannot come back, right? They can't arrest them the first time. If they could, the theory would be obstruction. The officer told you to do something, you refused to do it. Thank you very much.
judges: Dw Nelson, Berzon, Clifton, Cjj